UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| JENEAN MCBREARTY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 5:16-121-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| DR. VICTOR KAPPELER, et al., | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon cross-Motions for Summary Judgment filed by Defendant Carole Garrison [DE 44] and Plaintiff Jenean McBrearty, pro se [DE 40; Response at DE 45].[1] McBrearty argues that Garrison violated her right to free speech and to due process under the First and Fourteenth Amendments to the United States Constitution when Garrison, as her instructor, removed a post that McBrearty made to a class discussion board and then somehow injured her chances of obtaining future employment at Eastern Kentucky University.

"To successfully establish a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must prove two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal

---

[1] Defendant Garrison's Motion for an Extension of Time [DE 41] to file a Response to Plaintiff Garrison's Motion for Summary Judgment is well-taken and will be granted.

law." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Garrison does not dispute she was acting in her official capacity as an EKU professor at all times relevant to McBrearty's claims, and therefore does not deny she was acting under color of state law. However, despite McBrearty's assertions, Garrison argues and the Court agrees that Garrison conduct did not violate any of McBrearty's constitutional rights for the reasons set forth in this opinion. Therefore, Garrison is entitled to summary judgment on all claims made against her, and McBrearty's Motion for Summary Judgment will be denied.

## I.

Plaintiff McBrearty enrolled in Defendant Garrison's online PLS 326 class, "Police, Liability and Ethics," at Eastern Kentucky University ("EKU"). As part of the class, students were expected participate in online discussions, contained on a Blackboard discussion page. As the parties explain it, only those particular individuals enrolled in Garrison's PLS 326 class were permitted access to the discussion thread at issue. There was no "general access" to these discussions; rather, Garrison's students had to obtain permission to access the forum by way of enrolling in the course. Each week, Garrison would post a discussion board prompt, and students were expected to both respond to the initial post and respond to two of their classmates' posts. Student participation

in these discussions was reflected as 10% of the student's overall grade in the course.

In the seventh week of the course, Garrison posted this discussion prompt:

> Imagine you are a newly appointed Police Chief of a brand new department. A newly chartered small city has hired you to organize and staff this state of the art professional police department. Identify and define operationally/thoroughly each of five characteristics, values or traits you will look for in people you hire for our department. Be sure to defend why these are the five most important things to look for in recruiting professional police officers (what consequences are there if this characteristic or value is present or absent that is critical to an effective law enforcement agency).
>
> Examples, but you can use your own if you can defend them: courageous, self-control, generous, high-minded, gentle truthfulness, modest, empathetic, imaginative, decisive, good communicator, aware, educated, respectful, tolerant, physically fit, honest.

McBrearty responded at length and concluded with the following statement:

> What I'd look for in my officers is what the military once looked for in its officers: Renaissance people with the ability to innovate, seize the initiative, and maintain high standards of performance in the line of duty. I'd want them to have the sound judgment of an Eisenhower, the initiative of a Patton, the courage of a Churchill, and the determination of a Hitler.

Two students responded with short comments on the relative merits of crafting a police force comprised of individuals with

military police training. Then, a third student offered an extended response addressing many points, including Eisenhower's decision to send federal troops to keep the peace in Little Rock during the integration of Central High School in the wake of *Brown v. Board of Education* and the protection of the First Amendment and other constitutional provisions by police officers. He continued,

> Auschwitz, Sobibor, Treblinka, etc. . . . are examples of Hitler's determination, a genocide where 11 million or possibly more people died. Under Hitler's rule, Germany invaded or occupied Czechoslovakia, Austria, Poland, Denmark, Norway, Belgium, France, Yugoslavia, Greece, and the Soviet Union among others. The Second World War resulted in approximately 70 to 80 million deaths. One cannot forget the Nuremberg Laws that Hitler and the Nazi party enacted that racially divided German society and helped lead German into the holocaust.
>
> Jenean, I hope that you can appreciate how evoking the name or image of Hitler can bring about strong emotions within people. I respect your right to use him as an example, but I question its validity in this measure. Hitler's determination was not based in moral outcomes for himself, his people, or the world.

McBrearty responded, in part:

> With all due respect, I said I would want my officers to have "the determination" of a Hitler, not that I would want them to believe as he did or behave as he did. But he was one determined individual! Few people know he served honorably in WWI and won the Iron Cross. He was not a "coward" or sex pervert. There is much propaganda about him that was BS --- and used by politicians everywhere as an accusation of corruption. Like the word racism, racist, and sexist, etc. I'm no longer

cowed by or afraid of words. And, having read the first three Chapters [*sic*] of Mein Kampf, I understand where he was coming from and just how disenfranchised the German people felt….not unlike how minorities feel. Yes, I know alluding to him evokes strong emotion, but that's the point. We cannot be afraid of words, dead people, or ideas.

How can we have a real conversation about anything when we are gagged by PC, by fear, by aversion to ideas? Hitler is used as a bogeyman, but do we ever contemplate that Stalin's regime killed twice the number of people that Hitler's regime did? And Chairman Mao, three times as many? How many students know about The Great Leap Forward that killed off so many of China's intellectuals? About show trials? How many students have read Koestler's Darness [*sic*] at Noon? Communism has jailed, tortured, enslaved, and butchered twenty times the number of people Hitler killed yet we hear nothing about this. Our history books don't teach our children about the evils of Communism, of statism, and the government shredding of our Constitution. We are not allowed to talk about the horrors of Islam, of the connection between the black power movement and islam [*sic*]. How many people know the name of Elijah Muhammed, and the Nation of Islam that preaches black racism and separatism? About these things, we must be silent, even though a "conversation" is a two-way street.

If we are to be free, we must exercise our right to free speech. Use it or lose it. When people can be gunned down and the perpetrators excused by our government because a cartoon contest was "insulting" to a religion, it is time we seriously examine how suppressed we really are. Since when do we yield our rights because someone is offended? We must stop being afraid of words.

Garrison decided to remove the thread, including McBrearty's post and the comments on it. She explained that she did so once another student and McBrearty began commenting and discussing a subject which had nothing to do with the initial assignment nor was related to preparation for their final examination in the course. Garrison did not pursue EKU's student disciplinary procedures against McBrearty nor was McBrearty's grade impacted as a result of the discussion or Garrison's decision to remove the thread, as McBrearty received an A in the course. From Garrison's perspective, that was the end of the matter, but not so for McBrearty, who repeatedly sought recourse from the administration of EKU to no avail and claims that her opportunities for employment at EKU were injured.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The Court reviews all evidence and draws all inferences in the light most favorable to the nonmoving party. *Chapman v. UAW Local 1005,* 670 F.3d 677, 680 (6th Cir.2012) (en banc); *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. The non-moving party may not "rely on subjective beliefs to show a genuine dispute" nor may they "defeat summary judgment by conclusory responses." *ACLU v. Mercer County*, 240 F. Supp. 2d 623, 625 (E.D.Ky. 2003).

To successfully establish a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must prove two elements: "(1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Professor Garrison does not dispute she was acting in her official capacity as an EKU professor at all times relevant to McBrearty's claims, and therefore does not deny she was acting under color of state law. McBrearty argues that Garrison's decision to remove the thread from the class discussion forum constitutes a violation of her right to free speech under the First Amendment and that it somehow violated her right to due process under the Fourteenth Amendment to the United States Constitution because she lost future employment opportunities at EKU. On the facts before this Court, no reasonable juror could find that Garrison's actions violated

McBrearty's constitutional rights, as explained below, and her § 1983 claim fails in this regard. Summary judgment will be denied to McBrearty and will be granted in favor of Garrison.

### III.

Among other things, this case presents a unique variation on Godwin's Law, the Internet adage and special case of the Bernoulli trial sometimes referred to as *reduction ad Hilterum*: as an online discussion grows longer, the probability of a comparison involving Hitler approaches one. *See* Mike Godwin, *Meme, Counter-meme*, WIRED (October 1, 1994, 12:00 PM), https://www.wired.com/1994/10/godwin-if-2/ (last viewed on January 8, 2018) (permalink at https://perma.cc/C48Y-KB5K); *see also*, "Godwin's Law," Oxford English Dictionary, http://www.oed.com/view/Entry/340583?redirectedFrom=godwin%27s+law#eid (last viewed on January 8, 2018) ("A facetious aphorism maintaining that as an online debate increases in length, it becomes inevitable that someone will eventually compare someone or something to Adolf Hitler or the Nazis."). Plaintiff McBrearty made the comparison right away in the thread, albeit in a way that was, at least, initially flattering. One of her classmates eventually took her to task and argued, as Godwin observes, that the comparison "trivialized the horror of the Holocaust and the social pathology of the Nazis," Godwin, https://www.wired.com/1994/10/godwin-if-2/. Thus, the game was

afoot until Garrison removed the thread in an effort to restore order to the online discussion.

McBrearty's speech and Garrison's actions are subject to analysis under the First Amendment to the United States Constitution, as students retain the robust constitutional right to freedom of speech at school and in their class assignments, but the constitutional rights of students in schools must be "applied in light of the special characteristics of the school environment." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969)). "[W]here state-operated educational institutions are involved, this Court has long recognized 'the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Tinker*, 393 U.S. at 507).

In *Barr v. Lafon*, 538 F.3d 554, 563-64 (6th Cir. 2008), the Sixth Circuit addressed the three types of student speech and when and how each type may be regulated:

> (1) under *Fraser,* a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech, (2) under *Hazelwood,* a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns, and (3) the *Tinker* standard applies to all other

> student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline[.]²

(internal citations omitted).

Looking at McBrearty's speech as school-sponsored speech under *Hazelwood*, the finder of fact is concerned with whether Garrison removed the thread because of her concern that students were being disrupted and distracted from their education and, in particular, the departure of the thread from the pedagogical purpose of the discussion assignment. "Public educators may limit 'student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.' The neutral enforcement of a legitimate school curriculum generally will satisfy this requirement[.]" *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (applying the *Hazelwood* test for regulating student speech to college settings) (internal citation omitted). The "First Amendment does not require an educator to change the assignment to suit the student's opinion or to approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard." *Brown v. Li*, 308

---

² McBrearty argues that Garrison's real reason for removing the thread in question is because the professor found the content of her speech objectionable. Even if the Court assumes that Garrison found the speech objectionable, the undisputed material facts show that Garrison removed McBrearty's thread because she found it disruptive and off-topic. *See* Garrison Depo. at 27 ("I don't remove posts that are objectionable. I remove posts that disrupt my class."). Thus, no evaluation is needed of McBrearty's speech under the *Fraser* doctrine.

F.3d 939, 949 (9th Cir. 2002). "It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so 'directly and sharply implicate[d],' as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (internal citation omitted).

In light of the undisputed material evidence in this matter, no reasonable jury could conclude that Garrison's decision had no valid educational purpose or was not reasonably related to legitimate pedagogical concerns. The thread in question, which began with McBrearty's relevant if controversial invocation of Hitler's qualities in an assigned discussion of police leadership qualities, quickly devolved into a series of posts centered on political correctness, McBrearty's distaste for "PC culture," and the supposed dangers of Islam, and references to how she believes that history has maligned Hitler, not about qualities and characteristics of police leadership – not even those which might mirror Hitler's leadership qualities. Because Garrison's decision to intervene and remove the thread was tied to the fact that it had gone off topic, it was legitimately related to the educational purpose of moderating an educational discussion on the subject of police leadership qualities and the legitimate pedagogical concern

of keeping the students on topic and on task in their on-line discussion.

Alternatively, looking at the disruptive speech analysis available under *Tinker* on the same facts, there is no evidence from which a reasonable jury could conclude that Garrison unreasonably believed that the speech could be suppressed because it would substantially and materially interfere with schoolwork or discipline. *Tinker*, 393 U.S. at 591; *see also Morse v. Frederick*, 551 U.S. 393 (2007); *Lowery v. Euverard*, 497 F.3d 584, 593 (6th Cir. 2007) (standard does not require any disruption to have occurred). The undisputed material facts show that the on-line discussion among the students went off the topical rails, and it follows that Garrison was entitled to remove the thread to prevent the thread from substantially and materially interfering further with the forum discussion assignment.[3]

---

[3] The same result is reached upon applying the more broadly applicable "forum" analysis to these facts. In order to apply a forum analysis, "a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985). The Court may apply a forum analysis because the Blackboard program used in Garrison's course, from which the subject thread was removed, is essentially "public property" owned and operated by EKU, a public state university. *See Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (recognizing the application of forum analysis to expressive activity within educational settings and applying forum analysis to Kentucky State University's confiscation of yearbooks); *see also Cornelius*, 473 U.S. at 797 (when a plaintiff alleges a violation of her First Amendment right to speak, a plaintiff must prove: (1) the speech was protected by the First Amendment and (2) the government excluded the plaintiff's speech in a public or non-public forum without justifying its actions to the standard required for the particular forum). Blackboard serves as a "nonpublic forum," to which EKU may control access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Kincaid*, 236 F.3d at 348 (internal citations omitted). Here, only those particular individuals enrolled in Garrison's PLS 326 class were

Neither could a jury conclude that McBrearty was denied due process by Garrison from the undisputed material facts presented. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972). McBrearty asserts no cognizable deprivation of procedural due process. She was not disciplined for her post on the Blackboard discussion board, so there could be no process denied under the disciplinary policy and procedures to which students are entitled. To the extent that McBrearty alleges that she was deprived of a substantive liberty or property interest because she lost future employment opportunities as a facilitator for on-line courses at EKU, the situation does not implicate due process. Impairment of future government employment opportunities due to injury to reputation is

---

permitted access to the discussion thread at issue. Garrison provided no "general access" to these discussions; rather, her students had to obtain permission to access the forum by way of enrolling in the course.

"[A] speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, *see Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), or if he is not a member of the class of speakers for whose especial benefit the forum was created, see *Perry Education Assn., supra*[.]" *Cornelius*, 473 U.S. at 806. Garrison was free to preserve the forum for its intended purposes as long as the regulation of speech was reasonable and did not attempt to suppress speech due to the speaker's viewpoint. *See Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 46 (1983). The reasonableness of the restriction of speech in a nonpublic forum "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. The evidence at bar demonstrates that Garrison removed McBrearty's thread because it was, ultimately, off-topic for the forum and, thus, disruptive of the online class forum, not because it was objectionable. No reasonable jury could determine that this violated McBrearty's First Amendment right to free speech.

not a protected liberty interest for purposes of due process. *See Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (alleging impairment of future employment opportunities does not state a claim for denial of a constitutional right when former employee brought §1983 suit against his former employer for informing his future employer that he was unfit for the position); *but see Paul v. Davis*, 424 U.S. 693, 706 (1976) (holding that injury to reputation may deprive a person of a liberty interest when the injury is combined with the impairment of "some more tangible" government benefit such as the "loss of government employment."). Here, even if McBrearty could demonstrate that Professor Garrison had actually precluded her from potential employment at EKU, McBrearty has not been deprived of a protected liberty or property interest. Accordingly, her claim for violation of due process under the Fourteenth Amendment fails as a matter of law.

**IV.**

For all of the reasons explained above, Plaintiff McBrearty's claims against Defendant Garrison fail.

Accordingly, **IT IS ORDERED**:

(1) that Defendant Garrison's Motion for an Extension of Time [DE 41] to file a Response to Plaintiff McBrearty's Motion for Summary Judgment is **GRANTED;**

(2) Plaintiff McBrearty's Motion for Summary Judgment [DE 40] is **DENIED;**

(3) Defendant Carole Garrison's Motion for Summary Judgment [DE 44] is **GRANTED**.

This the 9th day of January, 2018.

Signed By:
*Joseph M. Hood*
Senior U.S. District Judge